

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 06 C 4822 |
| ) | |
| HILARIO SANTOS ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Hilario Santos pled guilty to a charge of possession of cocaine with intent to distribute, and the Court sentenced him to the mandatory minimum prison term of ten years. In September 2006, Santos filed a *pro se* motion under 28 U.S.C. § 2255 seeking to vacate his conviction and sentence. In the motion, Santos asserted several claims of ineffective assistance of counsel: his trial lawyer failed to investigate and present an entrapment defense and gave him poor legal advice about that defense; did not file pretrial motions or investigate a co-defendant's credibility; did not inquire whether Santos understood the proceedings at his guilty plea; and erroneously advised Santos that he was eligible for the "safety valve" under the Sentencing Guidelines. The Court ruled that the last of these claims was addressed in Santos's direct appeal and thus could not be asserted in a section 2255 motion but ordered a hearing on the other claims. *See* Order of Mar. 8, 2007. The Court appointed counsel to represent Santos at the hearing.[1]

The Court initially bifurcated the issues for hearing, determining to address first whether trial counsel had performed deficiently and second whether any deficient performance prejudiced

---

[1] The Court thanks Santos's appointed counsel, Arthur Gollwitzer III and Christopher R. Parker of Michael, Best & Friedrich LLP, for their thorough and vigorous advocacy on behalf of Santos.

Santos. After completing the evidentiary hearing on the first issue, the Court advised the parties that it was concerned that the evidence on the two bifurcated issues might overlap and that for this reason, the Court was not comfortable addressing the issue of deficient performance alone without hearing argument regarding how Santos claimed to have been prejudiced by his attorney's conduct. Santos thereafter submitted a written offer of proof detailing the prejudice he claims to have suffered due to his trial counsel's allegedly deficient performance, and both sides were given the opportunity to address the offer of proof fully and completely in writing.

For the reasons stated below, the Court concludes that Santos has not established that his trial counsel's performance was deficient when measured against constitutional standards and therefore denies his section 2255 motion.

**Facts**

Santos was charged with knowingly and intentionally possessing more than five kilograms of cocaine and a quantity of marijuana, with intent to distribute. He entered a "blind" guilty plea to the charge – that is, he pled guilty without a written plea agreement. His attorney at the time of his guilty plea and sentencing was Nishay Sanan.

At the guilty plea hearing, Santos stated that he had had enough time to discuss the case with Sanan; he had told Sanan everything he knew about the case; Sanan had answered all his questions; and he was satisfied with Sanan's work and with his advice. Oct. 21, 2004 Tr. at 6. In response to direct questions by the Court, Santos admitted that he helped make arrangements to transport more than five kilograms of cocaine to Chicago for the purpose of distributing it to others, and that he knew the substance was cocaine. Santos said, "I was sent to come here and make sure everything turned out okay, that everything got delivered." *Id.* at 20-21. Santos

2

admitted that he had more than five kilograms of cocaine in his possession and that it was his intention to distribute it to his co-defendant, William Robinson. *Id.* at 21-22.

Sanan testified at the evidentiary hearing on the present motion, and the Court found his testimony credible. Santos retained him in late July 2004 to replace his prior attorney, Michael Gillespie, and Sanan filed his appearance in the case in mid-August 2004. As indicated above, Santos pled guilty on October 21, 2004. When he met with Santos, whose primary language is Spanish, Sanan had an interpreter with him.

Sanan stated that in their meetings, Santos told him that Faustino Calderon, the owner of a trucking company whom Santos had known for some time, asked him to recruit someone to drive truckloads of narcotics cross-country. Calderon then sent Martin Moreno – whom Santos initially said he had met just a few months before his arrest – to follow up, and Moreno importuned Santos to help in the plan to transport the narcotics. Santos told Sanan that Moreno called him on numerous occasions, sometimes several times a day, and that he offered to train Santos to drive a truck if he would help them out. Santos advised Sanan that at the time he was unemployed and needed money to support his family and that he eventually agreed to assist. July 12, 2007 Tr. at 18-22.

For reasons that are not clear from the evidence, however, Moreno, not Santos or someone recruited by him, ended up driving the load of narcotics cross-country. Santos' role, by contrast, involved locating a supplier of cocaine and assisting in its delivery upon its arrival in Chicago.

Sanan was aware, either from Santos or otherwise, that Moreno drove to Chicago a red tractor pulling a semitrailer. While en route to Chicago, Moreno called the authorities and told

3

them that he had ten or more kilograms of cocaine hidden in the truck. Sanan was also aware that Moreno was arrested but was not charged in the original criminal complaint and that narcotics agent had "let Mr. Moreno walk away," evidently without even interviewing him regarding the drug deal. *Id.* at 26-27.

Sanan testified that he had not interviewed Moreno but that he had asked the prosecutor to disclose Moreno's location. The prosecutor advised, however, that the government did not know Moreno's whereabouts. Sanan stated that reports produced by the government in discovery indicated that Moreno was not a government informant – though the reports reflected, as noted earlier, that Moreno had contacted the authorities to report that he was transporting drugs. *Id.* at 27-30.

Sanan also stated that Calderon had previously been convicted of a federal crime. He did some research and determined that Calderon was no longer in custody and was on supervised release. He did not, however, learn Calderon's whereabouts and did not interview him. He attempted to do research on Calderon's trucking company but learned nothing of value. *Id.* at 30-31.

At the hearing on Santos's section 2255 motion, Sanan testified that Santos "believed he was set up." *Id.* at 32. He "believed Mr. Moreno was a government informant, and so we talked about entrapment and how entrapment works." *Id.* at 33. Sanan stated that he met with Santos on several occasions to discuss his case and explain the options for resolving the case. Sanan stated that he explained to Santos the elements of an entrapment defense and advised him that the defense was not tenable in his case. Sanan Affid. ¶ 6; July 12, 2007 Tr. at 33. In an affidavit submitted by the government in response to Santos's section 2255 motion, Sanan stated that

4

Santos "repeatedly indicated to me his desire to plead guilty, and not to take his case to trial." Sanan Affid. ¶ 5.

On cross examination by the prosecutor, Sanan testified that in his earlier meetings with Santos, Santos claimed that the occasion at issue in the indictment was the only time he had dealt with Moreno and that they had no prior drug dealings. *Id.* at 36. Later, however, Santos told Sanan that he and Moreno had done prior drug deals and explained that he had not told Sanan the truth at the outset because he "didn't trust lawyers." *Id.*

Sanan asked Santos to prepare a detailed summary of the events, and Santos did so, providing him with a lengthy handwritten statement, which Sanan had translated into English. In the statement, Santo stated that he had made two trips with Moreno to transport cocaine to Chicago prior to the one at issue in the case. He stated that he had met Moreno through Calderon and that for several months, Calderon and Moreno asked him to locate drugs to bring to Chicago. According to Sanan, Santos told him that after several months, he located a source of narcotics in California, a man whom he knew as "El Chori." Santos also told Sanan that in connection with the incident charged in the indictment, he had transported the drugs to Chicago at El Chori's direction. Santos never indicated that El Chori was a government informant. *Id.* at 36-40.

Sanan testified that when he discussed a possible entrapment defense with Santos, he advised Santos that the defense was not viable because there was no indication that Santos had been "push[ed] . . . into doing the crime" by a government agent or informant. *Id.* at 41. In particular, he advised that there was no indication from the law enforcement reports he had received that Moreno was an informant. *Id.* Sanan advised that he did not believe that the fact that Moreno had turned himself in to the police was enough to enable Santos to assert

5

entrapment. *Id.* at 42. He further told Santos that even if Moreno had been a government informant and had convinced Santos to locate the narcotics in California, the fact that Santos had voluntarily come to Chicago to participate in unloading the drugs and transferring them to co-defendant Robinson "was going to defeat the whole entrapment defense because no one put a gun to his head or no one forced him to fly up here. The drugs were already on the truck. He could have stayed in California." *Id.*

Sanan went on to testify that if Moreno had been a government informant "[t]hat would have made the entrapment defense a little more viable, but [he] still had problems with it because Mr. Santos would have had to testify for the entrapment defense, in my opinion, to work in this case." *Id.* This was significant because with Moreno apparently unavailable, Santos "was the only one that could advance an entrapment defense by having to testify that this person either forced me or coerced me or made me do this." *Id.* at 43; *see also id.* at 46. But if Santos testified, Sanan stated, he would have had to testify that he had flown to Chicago to assist in unloading the drugs, and that "would have destroyed the believability in my opinion of the entrapment defense . . . ." *Id.* Sanan also noted that the government had produced a videotape showing Santos actually unloading the cocaine from the truck and putting it into Robinson's car. *Id.* at 45.

Drug Enforcement Agency agent Keith Landa testified that he had a lead role in the investigation that led to Santos's arrest. *Id.* at 53. He indicated that the investigation began as an investigation of Martin Moreno. *Id.* at 57-58. The initial reports reflected that an unnamed confidential source was in contact with Moreno and advised the DEA that Moreno was leasing the tractor that was ultimately used to transport the cocaine at issue in Santos's case. *Id.* at 58-

61. In June 2003, Moreno asked the source to help him get the truck out of an impoundment yard. *Id.* at 61. Moreno later advised the source that he intended to drive the truck to Houston, Texas and return with a load of narcotics. *Id.* at 63. After the source advised the DEA of Moreno's plan, the DEA obtained a court order allowing the placement of a tracking device on the truck. *Id.* A later report indicated that the source advised the DEA that Calderon, for whom Moreno sometimes worked, would be paid a fee for providing a trailer to transport the drugs. *Id.* at 65-66.

Landa testified that the DEA later learned that Moreno had called the Summit, Illinois police department and advised that he was transporting a load of narcotics. *Id.* at 67-69. DEA and local law enforcement agents met with Moreno, who advised that he was supposed to pick up Santos at Midway Airport the next day and then turn over the drugs to Santos. *Id.* at 70, 84. The DEA set up surveillance of Moreno and observed him pick up Santos and take him to Melrose Park, Illinois. *Id.* at 70, 84-85. Eventually they went to a restaurant where they waited for a period of time until Robinson arrived. *Id.* at 86. Santos then drove Robinson's vehicle to another location, where he retrieved a package from a truck and put it into Robinson's vehicle and then returned to the restaurant, where he turned over the vehicle to Robinson. *Id.* at 87. All three men were taken into custody; the package was found to contain a quantity of cocaine. *Id.* An additional quantity of cocaine and marijuana was later found in the truck from which Santos had retrieved the package given to Robinson. *Id.*

Moreno was released without being charged, in consideration of his cooperation in reporting the transaction to the authorities. *Id.* at 80. The decision was made to try to continue to work with Moreno to attempt to target other persons. *Id.* at 89. Landa stated that there were no

DEA reports indicating that Moreno had been interviewed following the arrests. *Id. at 76.* He testified that he was unaware of any explanation Moreno had given for why he had turned himself in. *Id.* at 80, 80-89.

Landa testified that the DEA had not paid Moreno for his information and that he was not and never had been listed as a DEA informant. *Id.* at 76-77. He further testified that Moreno was not acting at the DEA's behest when he turned himself in and had not been acting on the DEA's behalf prior to that time. *Id.* at 82. Landa stated that shortly after the arrest, the DEA lost track of Moreno and had no further contact with him. *Id.* at 78-79.

Santos testified only briefly at the evidentiary hearing. He stated that at the time of his arrest, he had been unemployed for six months. *Id.* at 104. He testified regarding his dissatisfaction with attorney Gillespie but gave no testimony regarding his communications with attorney Sanan, his dealings with Moreno and Calderon, or his decision to plead guilty. *Id.* at 105-09, 111-14.

**Discussion**

To prevail on a claim of ineffective assistance of counsel, a convicted person must show that "counsel's representation fell below an objective standard of reasonableness" and "any deficiencies in counsel's performance [were] prejudicial to the defense . . . ." *Strickland v. Washington,* 466 U.S. 668, 687-88, 692 (1984). When a defendant has pleaded guilty, prejudice requires a showing "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985).

The evidence presented to the Court reflects that Santos told his lawyer, Sanan, that prior

8

to the narcotics transaction for which Santos was indicted, he and Moreno had transported cocaine to Chicago on two earlier occasions. With regard to the transaction at issue in the indictment, Santos told his lawyer that both Calderon and Moreno asked him to try to find a source for cocaine to bring to Chicago. According to Santos, Moreno called Santos repeatedly and urged him to help out. Santos eventually located a source for cocaine – El Chori – and helped make arrangements to transport cocaine to Chicago from California, where El Chori lived. Moreno drove the cocaine to Chicago, and Santos came here from Texas to participate in unloading the cocaine and transferring it to Robinson.

Sanan also was aware via the discovery process that while driving to Chicago, Moreno called the authorities and reported that he was transporting cocaine. He was debriefed by law enforcement and identified Santos as a co-participant. The information that Moreno provided allowed law enforcement to observe the delivery and arrest other participants in the deal. Santos was also aware that despite Moreno's integral involvement in the narcotics deal, he was never charged with a crime.

This set of facts, standing alone, would give any reasonable criminal defense lawyer in Sanan's position reason to wonder when Moreno had begun acting as a government informant. The notion that Moreno would have, out of the blue, "gotten religion" on the way to Chicago and reported himself to the authorities is not entirely implausible, but any reasonable defense lawyer would have to be skeptical that this is all there was to the story. To put it another way, this scenario, standing alone, would lead a reasonable defense attorney to wonder whether Moreno had been acting as a government informant at the time Santos claimed Moreno had importuned him to help find a source of narcotics.

The fact that the government agents' reports did not disclose that Moreno was a DEA informant was not enough, without more, to put to rest the suspicions that a reasonable defense attorney would have regarding Moreno's status. First of all, in view of the fact that Moreno contacted the Summit police department, it was entirely possible that he had been working as an informant for that department rather than for the DEA. Second, despite the case agent's contention that the DEA registers all of its informants, virtually everyone involved in the criminal justice system is aware of, or has had experience with, "off the books" informants. In any event, a defense attorney's job typically does not stop with taking a government agent's word for something of this nature, absent good reason to do so.

Despite the reasonable basis for suspicion that Moreno's status could not be taken at face value, the facts that Santos conveyed to Sanan gave Sanan a reasonable basis not to investigate further regarding Moreno's potential status as an informant and to advise Santos that a claim of entrapment was untenable. The bare fact that Moreno might have been a government informant would not have been enough to entitle Santos to an entrapment instruction at trial. Indeed, the fact that Moreno encouraged Santos, even repeatedly, to become involved in a drug deal would not have been enough to avoid conviction under the circumstances as Santos presented them to Sanan.

Entrapment occurs when a government agent or government informant "originate[s] a criminal design, implant[s] in an innocent person's mind the disposition to commit a criminal act, and then induce[s] commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992). In Santos' version of the events as communicated to Sanan, Moreno had, in fact, planted the idea for the particular drug deal

10

involved in the criminal charge against Santos. But "[f]or an entrapment defense to be proper, [Santos] needed to show an extraordinary inducement, 'the sort of promise that would blind the ordinary person to his legal duties.' If a person takes advantage of a simple, ordinary opportunity to commit a crime - 'not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person' - then the person is not entrapped." *United States v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006) (quoting *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991)). *See also, e.g., United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999) (discussing factors considered in determining whether entrapment has occurred). Nothing in what Santos told Sanan suggested that Moreno had presented him with anything other than an ordinary opportunity to commit a crime.

In addition, the "most important factor [in determining whether entrapment has occurred] is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement." *Blassingame*, 197 F.3d at 281 (quoting *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983)). Santos' statements to Sanan, both written and oral, did not hint at any reluctance on his part to become involved in the drug deal.

In determining that further investigation of an entrapment defense was unnecessary, Sanan was entitled to rely on what Santos told him about his dealings with Moreno and Calderon. Under the circumstances, one reasonably would expect Santos to present in the most exculpatory (or least inculpatory) way possible his conversations with people he claimed were more culpable than him. *See* July 12, 2007 Tr. at 24.

Given what Santos told Sanan, it was reasonable for Sanan to conclude that even if everything Santos had said was true, further inquiry would be unproductive because a claim of

entrapment would not be viable. The scenario that Santos presented involved taking advantage of an ordinary opportunity to commit a crime – one in which "the ordinary profits of crime [were] incentive enough to [Santos] to commit crimes; he [was] ready and waiting; all that [was] wanting is the opportunity." *Evans*, 924 F.2d at 717, *quoted in Blassingame*, 197 F.3d at 281. There was no indication from Santos' rendition of the events that he was the least bit reluctant to participate or that Moreno had to do anything other than ask; there is no suggestion that Moreno or anyone else offered or gave Santos any sort of unusual or extraordinary benefit; and there is no evidence that anyone exerted any pressure on Santos other than by repeatedly asking him to help out. For these reasons, Sanan did not act unreasonably in determining that further investigation of Moreno or Calderon was unnecessary or in advising Santos that a claim of entrapment would not be viable.

Though unnecessary to the Court's decision in the case, the Court also notes that the fact that Santos had previously participated in two other similar drug deals with Moreno would have been particularly damning had Santos gone to trial. Though (as Santos argues) the government likely was unaware of this when it charged Santos, the government unquestionably would have become aware of it had Santos had pursued a claim of entrapment. For Santos to advance a claim of entrapment, either he or Moreno would have had to testify at trial. Any reasonable defense lawyer would have had to assume, and to advise Santos, that his prior drug dealings with Moreno likely would be exposed and would completely undermine any claim that Santos lacked predisposition to commit the charged offense.

For these reasons, the Court rejects Santos' claim that Sanan acted unreasonably in failing to investigate and present an entrapment defense and gave him poor legal advice about that

12

defense.

The Court likewise rejects Santos' two remaining claims. First, Santos has not identified any pretrial motion that Sanan could have presented that would have had any impact on the outcome of the proceedings or on Santos' decision to plead guilty, and he has not identified anything that further investigation about his co-defendant (Robinson) would have turned up that could have helped Santos in any way. Second, the Court has again reviewed the transcript of the hearing at which Santos pled guilty, and there is no basis for any sort of claim that Santos' plea was anything other than knowing and voluntary.

## Conclusion

For the reasons stated above, the Court denies Hilario Santos' motion under 28 U.S.C. § 2255. The Clerk is directed to enter judgment in favor of the United States.

                                                                  _____
                                                                  MATTHEW F. KENNELLY
                                                                  United States District Judge

Date:   November 13, 2007